NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: November 29, 2022

S22A0969. YOUNG v. THE STATE.

MCMILLIAN, Justice.

After a jury trial in 2019, Tia Young was convicted of felony murder and other crimes in connection with the shooting death of her husband, George Young.[1] On appeal, Tia claims that the

---

[1] George Young was killed on November 16, 2017, and on June 27, 2018, a Gwinnett County grand jury indicted Tia Young and Harvey Lee for malice murder (Count 1), felony murder (Count 2), and aggravated assault (Count 3) in connection with George's shooting. Tia was also indicted separately for criminal attempt to commit a felony based on tampering with evidence to prevent Lee's apprehension (Count 4) and criminal attempt to commit a misdemeanor based on tampering with evidence to prevent her own apprehension (Count 5). Tia moved to sever the trial, which the trial court denied after a hearing.

At a trial conducted from March 25 through April 5, 2019, a jury found Tia guilty of Counts 2, 3, 4, and 5, and Lee guilty of Counts 1 through 3. On April 15, 2019, Tia was sentenced to serve life in prison with the possibility of parole for Count 2, two years and six months for Count 4, and six months for Count 5, to be served consecutively. Count 3 was merged into Count 2 for sentencing purposes. Lee was sentenced to serve life in prison without the possibility of parole, and, upon appeal to this Court, we affirmed his convictions. See *Lee v. State*, __ Ga. __, 2022 Ga. LEXIS 265 (Case No. S22A0720, decided Oct. 4, 2022).

evidence was insufficient to sustain her convictions as a matter of constitutional due process; that the trial court abused its discretion by denying her pretrial motion to sever her trial from the trial of her co-defendant, Harvey Lee; and that the trial court erred by improperly charging the jury on the counts for criminal attempt to tamper with evidence.[2] We affirm Tia's convictions because the evidence was sufficient to sustain her convictions, the trial court did not abuse its discretion in denying Tia's motion to sever, and any error in the jury charge on tampering with evidence was harmless.

---

On April 19, 2019, Tia timely filed a motion for new trial, which was amended on March 31, 2020, and on February 10, 2022. Following a hearing on February 14, 2022, the trial court entered an order denying the motion for new trial on March 25, 2022. Tia filed a timely notice of appeal on April 4, 2022. Tia's case was docketed to the August 2022 term of this Court and submitted for a decision on the briefs.

[2] Tia was convicted and sentenced for both misdemeanor and felony attempted tampering with evidence based on the same conduct, but she has not raised any merger claim on appeal. We decline to sua sponte address whether one may be convicted and sentenced for both felony and misdemeanor attempted tampering with evidence where the counts are based on the same conduct but directed at preventing the apprehension of two different criminal actors, which appears to be an issue of first impression. But we note that a valid claim that a conviction merges with another conviction renders any resulting sentence on the merged conviction void. See *Nazario v. State*, 293 Ga. 480, 480 (746 SE2d 109) (2013) ("A conviction that merges with another conviction is void – a nullity – and a sentence imposed on such a void conviction is illegal . . . .").

The evidence presented at trial showed that George and Tia Young were married and lived in Gwinnett County with their three children. George worked in security and hired Harvey Lee, a family friend, as a subcontractor and allowed Lee to live in the family's home.

Late on the night of November 16, 2017, George arrived home from working a security event and was shot twice on his front porch. Phone records from the night of the shooting show that George was on the phone with his co-worker, Latanya Knowles, while in the car on his way home. Knowles testified at trial that she and George were on the phone until George said he arrived home. The phone records show that the call ended at 11:23 p.m. Knowles testified at trial that George did not mention anything out of the ordinary during this call.

At 11:31 p.m., Tia called 911, and at 11:40 p.m., officers arrived to find George deceased, lying on his back on the front porch with his feet facing the door. The autopsy showed that two gunshots had entered the front of George's body, and the medical examiner testified that these wounds were the cause of George's death.

3

George's keys were still in the door, and a shell casing was on the porch. The home had a security system with a camera facing the front door, but the device was not working at the time of the shooting. George's eldest son testified that the camera had been broken for many months.

When interviewed by police at the scene, Lee said that he was at the kitchen table on his computer when he heard gunshots. He then ran upstairs to get his pistol, came downstairs, and saw George on the ground. Lee ran back upstairs, put the gun away, and told Tia to call 911. Lee told police that he returned to George and performed CPR until a neighbor arrived and took over for him.

Tia told officers at the scene that she woke up to the sound of two gunshots. She said that Lee went to grab his gun and told her to call 911. When asked about problems in the home, Tia told officers that they "stay broke." She said she had recently lost her job and that George had recently borrowed money from different people. She also told officers that George had previously mentioned that a white SUV followed him on two occasions, and that, on one of these

occasions, the SUV tried to run George off the road.

One neighbor testified that he heard gunshots and, after consulting with his family about the noise, looked out of his window where he could see the front of the Young house. Less than ten minutes after hearing the gunshots, the neighbor noticed a person moving from the direction of the Young house to a vehicle in the driveway and testified that the person was "hunched over or . . . did something to the vehicle" before running back toward the house. The neighbor continued watching and saw the person do the "exact same thing again" a minute or two later.

George and Tia's three children slept through the shooting and neither heard nor saw anything. The eldest child testified that he was a heavy sleeper. Another of the children was prescribed sleeping medication, and although he did not take it regularly, Tia had given him a sleeping pill that night. Tia's mother, who also lived in the home, explained that she did not hear anything because her television's volume was high. Seven neighbors testified at the trial about hearing the gunshots, but only one testified about hearing a

car leave the scene after the gunshots.

Officers searched the home and found two handgun holsters and one handgun in Lee's room, as well as a rifle in Lee's truck. A firearm examiner determined that the shooter used a .40-caliber M&P Smith and Wesson handgun. This weapon was never located, and there was no evidence that either Tia or Lee had ever possessed or purchased a .40-caliber Smith and Wesson handgun. Crime scene technicians performed gunshot residue tests on Lee's hands, but not Tia's, and found no residue on Lee's hands. No fingerprints were found on the bullets.

On November 17, the morning after the shooting, George's employer went to the Young home, and Tia asked him to help her find George's one-million-dollar life insurance policy, of which she was the primary beneficiary. Tia located the policy and notified the insurance company of George's death later that day.

That same day, Lee went to George's office building. He told a co-worker that George had been shot and killed. The co-worker asked about the home's surveillance camera, and Lee replied that

the camera was not working. Lee then asked the co-worker if he could continue to work for the security company as a subcontractor.

Later that same day, police officers asked Lee and Tia to go to the police station to speak with a detective, and they agreed. During Lee's interview, investigators questioned Lee about a person going to the victim's vehicle after George was shot. Lee told officers that he was removing a tracking device that he had placed under George's car. Lee also said that George had asked Lee to buy the tracking device, and if anything happened to George, George wanted Lee to know where George's car was and to take the tracking device off. Lee did not provide evidence of this agreement with George, and text messages between George and Lee introduced at trial contradicted the idea that George was aware of or consented to the tracking device that had been placed on his car. Lee told the investigators that the tracking device was in his bedroom.

The evidence introduced at trial also showed that, while away from home on November 17, Tia called a friend who had come to the Young home after hearing of George's death. Tia asked the friend to

7

find and "get" the cell phones belonging to both Tia and Lee, which were in their respective bedrooms. The friend did not comply with this request. At trial, the friend testified that Tia apologized and explained that she made the request because one of Lee's texts would have made him seem violent. The friend testified that Tia did not give an explanation for why she asked the friend to move her phone as well.

After the interviews, officers went to the Young home with a search warrant, seized the tracking device from Lee's bedroom, and subpoenaed records from the device. Officers also recovered cell phones from the home. Lee's phone revealed internet searches on October 28, 2017, about poisonous snake or spider venom for sale. Lee's phone history also showed that on the night of the shooting, while officers were still on the scene, Lee looked up a different murder case and an article about the defendant in that case pleading guilty. Tia's phone revealed a meme saved to her phone that said: "The fortuneteller says your husband will meet a violent end. The lady responds, will I be convicted?" The cell phone also contained e-

mails that revealed a romantic affair between Lee and Tia, which the two initially denied but eventually admitted when confronted with the e-mails. Both Lee and Tia were eventually arrested for George's murder and were tried together. Neither testified.

1. Tia asserts that the evidence was insufficient to sustain her convictions as a matter of constitutional due process. In reviewing sufficiency, this Court evaluates whether a rational trier of fact could have found all of the elements of the crime beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). "[W]e construe the evidence presented in the light most favorable to the verdict, and neither reweigh it nor determine witness credibility." *Terrell v. State*, 300 Ga. 81, 84 (1) (793 SE2d 411) (2016).

Here, the jury was presented with sufficient circumstantial evidence against Tia, which included the following. Tia was home at the time of the shooting, which happened as George was opening the front door, and the position of his body after the shooting indicated that he was shot from within the house. Tia and Lee were having an

affair and lied about it to police officers until confronted with e-mail evidence. Tia saved a meme on her phone of a woman asking if she would be convicted of her husband's death. Tia was also the beneficiary on George's million-dollar life insurance policy, which she called to inquire about the day after the shooting. Further, while on the way back from the police station the day after the shooting, Tia asked a friend to find and "get" her and Lee's cell phones, later telling the friend that she was worried the phone's contents would make Lee seem violent. Law enforcement determined that the cell phones contained incriminating evidence against both of them. This evidence was sufficient for a rational jury to find Tia guilty beyond a reasonable doubt for the crimes of which she was convicted as either a direct participant or as a party to the crimes. See OCGA § 16-2-20 (a) ("Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime."); OCGA § 16-5-1 (c) (felony murder); OCGA § 16-5-21 (aggravated assault); OCGA § 16-4-1 (criminal attempt); OCGA § 16-10-94 (tampering with evidence).

2. Tia next asserts that the trial court abused its discretion by denying Tia's pretrial motion to sever her trial from the trial of her co-defendant, Lee, because the evidence against Lee was strong and was unfairly counted against her. We disagree.

A trial court has the discretion to try jointly or separately defendants that have been jointly indicted for a felony where the death penalty is not sought. See OCGA § 17-8-4 (a). "The relevant factors in ruling on a motion to sever are: (1) the likelihood of confusion of the evidence and law; (2) the possibility that evidence against one defendant may be considered against the other defendant; and (3) the presence or absence of antagonistic defenses." *Terrell v. State*, 313 Ga. 120, 129 (4) (868 SE2d 764) (2022) (citation and punctuation omitted). On appeal, to show error in the denial of the motion to sever, Tia bears the burden of "establishing that a joint trial was so prejudicial as to amount to a denial of [her] right to due process." Id. (citation and punctuation omitted).

Tia and Lee were charged with the same offenses arising from the same incident, except for Tia's additional attempt to tamper with

evidence charges, and the State alleged that the two conspired to kill George. As such, much of the evidence introduced at the joint trial was applicable to and admissible against both Tia and Lee, and there was not a high likelihood of confusion of the evidence and law. See *Krause v. State*, 286 Ga. 745, 750 (5) (691 SE2d 211) (2010) (no significant likelihood of confusion of evidence and law or significant possibility that evidence used against one defendant would improperly be used against the other, where only two defendants were involved in the same incident giving rise to the same charges and were alleged to have acted together).

Further, Tia and Lee did not raise antagonistic defenses, such as each one saying the other shot George, nor has Tia shown that the existence of a potentially antagonistic defense prejudiced her trial. See *Krause*, 286 Ga. at 750 (5) ("[U]nless there is a showing of resulting prejudice, antagonistic defenses do not automatically require a severance." (citation and punctuation omitted)). Tia has not shown that the outcome of her trial would have been different had she been tried separately from Lee nor that she was prejudiced

by the joint trial. See *Pike v. State*, 302 Ga. 795, 799 (2) (809 SE2d 756) (2018). Accordingly, Tia has failed to show that the trial court abused its discretion in denying her motion to sever. See id.

3. Tia also asserts that the trial court erred by improperly charging the jury on her felony and misdemeanor attempted tampering with evidence charges (Counts 4 and 5), depriving her of due process. Tia objected to the jury charge at the charge conference and renewed the objection after the charge was given at trial, "preserving the issue for ordinary review on appeal." *Wynn v. State*, 313 Ga. 827, 839 (5) (874 SE2d 42) (2022). Upon review, this Court considers jury charges "as a whole." *Grimes v. State*, 296 Ga. 337, 343 (1) (b) (766 SE2d 72) (2014).

The indictment alleged that Tia took steps to conceal evidence "with the intent to prevent the apprehension" of Lee and herself, but the trial court also charged the jury using language from OCGA § 16-10-94 that tampering with evidence may be found if the intent was also to "cause the wrongful apprehension of any person or to obstruct the prosecution of any person[.]" However, the trial court

13

read Tia's full indictment to the jury at the beginning of the trial and instructed the jury during the jury charge to carefully read and examine the indictment, which was sent back with the jury for deliberations. The trial court also charged the jury that each element of each crime must be proven beyond a reasonable doubt. As such, any error in the jury charge's deviation from the indictment language was harmless because there is no reasonable probability that the jury could have convicted Tia based on the deviation from the indictment. See *Miller v. State*, 289 Ga. 854, 861 (8) (717 SE2d 179) (2011) ("[A] deviation from the indictment to the jury charge is not error where the trial court read the indictment in full to the jury and charged the jury that the State must prove each element of the crime as charged beyond a reasonable doubt."); *Reed v. State*, 285 Ga. 64, 65 (4) (673 SE2d 246) (2009) (When trial court read the aggravated assault count as it appeared in the indictment and instructed the jury on reasonable doubt, "[t]here is no reasonable probability that the jury could have convicted [the defendant] based on the trial court's instructional deviation from the language of the

indictment.").

*Judgment affirmed. All the Justices concur.*